The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court paper on New York and New York citizens shall be heard. God save the United States of America and this Honorable Court. Please be seated. Good afternoon, and let's call the case for argument. Yes, Judge. Today's case will be number 221881, Darwin Morillo Morocho v. Merrick B. Garland. At this time, would counsel for the petitioner please introduce herself on the record to begin. Good afternoon, Your Honors. May it please the Court, Tasha Bahal on behalf of Mr. Morillo. May I please reserve two minutes for rebuttal? Yes, you may. Thank you, Your Honors. I would first like to thank Your Honors on behalf of Mr. Morillo and his family for setting oral argument in this matter so quickly. At the time of Mr. Morillo's proceedings before the IJ and BIA, he was at serious risk of being tortured or killed upon his removal to Ecuador. Mr. Morillo was entitled to have those grave risks reviewed under the correct legal framework. That did not happen, and the government does not seriously contest that the wrong legal test was applied. Now on remand, an order from this Court is critically important to provide Mr. Morillo a pathway to safety. Mr. Morillo sought protection from torture by private criminal actors with the consent or acquiescence of a public official. Namely, in this case, the prison guards who are in charge of keeping him safe while he is being held in pretrial detention. That claim required application of a two-part test that is laid out in the governing regulations, 8 CFR section 1208.18. That test was also recently confirmed by this Court in the HH First Garland case. There is no real dispute as to what the proper test is to determine whether public officials would acquiesce or consent to torture, and there is no dispute that the immigration judge did not apply that test. The government never claims the IJ applied that test. Under the regulations, the IJ was required to ask, first, whether public officials had awareness of the torture, and second, whether the public officials would act to intervene to prevent that torture. What evidence is in the record to suggest that the Ecuadorian government is obligated to do more than it is currently doing right now in order to root out violence in the prison? The country conditions expert, Dr. Brotherton, talked at a high level about what the Ecuadorian president has done regarding the horrific prison conditions, for instance, declaring states of emergency. However, that evidence was not tied to an actual improvement on the ground of the prison conditions for someone in this situation as Mr. Murillo. Mr. Murillo is facing a heightened and particularized risk of torture in prison because of the situation he faced with the Salazano family. Did Mr. Murillo offer evidence to suggest that the government is not doing enough, and as to what is actually happening on the ground, rather than the high level? Certainly, Dr. Brotherton testified as to the horrific prison conditions on the ground. He testified as to a truce between prison inmates and gangs in prison and prison officials that allow those in prison to import and have access to contraband and weapons. He testified to beheadings and riots on the ground in prison. He testified to just horrific conditions about beheadings and mass killings and riots. What about the evidence about what the government is doing or is not doing? Dr. Brotherton talked about the actions at the highest level of the Ecuadorian government, and that evidence didn't provide any causation to show that the conditions on the ground were being improved by the actions taken by the upper echelons of the Ecuadorian government. So is that the piece that's missing is some experiential data after the high level interventions began? The evidence that's missing is that Mr. Murillo would actually be safe in the prison in Ecuador, and as your honors are aware, through the sealed filings that we provided, and I can't get into on the public record, but they speak to this very question. Mr. Murillo is not safe in the prisons. He is facing a very grave risk every day that he remains there, and there is no evidence that the Ecuadorian, that the actions that the Ecuadorian government has taken, and I am glad that they have recognized the problem, but there is no evidence in the record to suggest that the conditions on the ground for someone like my client who has- The premise of my question- I'm sorry, your honor. I thought I did agree with you. No, I want you to disagree if you- I just want to know your position. What's missing? I agree that what is missing is any evidence to show that my client would be safe in the Ecuadorian prisons where he's currently being held in pretrial detention. He is not safe there. Okay, but you said that there's no evidence that the intervention, that the actions taken by the government at the highest levels have led to improvements, so that's the piece that's missing, I take it. Correct, your honor. That is correct. Let me ask you, your client has been back in Ecuador right now in prison, correct? He is being held in pretrial- How long has he been there now? Like five, six months, right? He was removed in January. I believe it was January 5th. Okay, but he's been safe as of now? I disagree, your honor. We submitted with this court a sealed affidavit in supporting documentations. Again, I apologize, I can't get into a public record, but the evidence we submitted suggests that he is absolutely not safe. Okay, let me also ask you, the IJ found that the petitioner's evidence about the Solorzano, I guess I pronounced it right or wrong, family, that was incredible. So basically, the crux of your argument, the prison's condition by itself, correct? I disagree, your honor. Certainly the prison conditions are horrible in Ecuador, but my claim is not that anyone who would be imprisoned in Ecuador is at risk of torture. The argument is that my client is at a heightened or particularized risk, both because the prison conditions are horrible, but also because the prison guards are going to be unable and willfully breach their duty to keep him safe there because he is at a heightened risk and is a man marked by vengeance by the Solorzano family. Okay, but if the IJ doesn't find that credible, why is that, you know, I think we have to give deference to that finding. Two comments on the credibility finding, your honor. One, the immigration judge's finding as to my client's credibility was not actually adopted by the Board of Immigration Appeals, and I think as the government correctly concedes in its brief, it's not a question before this court at this time. But more than that, your honor, the IJ did credit a fair amount of evidence regarding the dangerous nature of the Solorzano family. So, for instance, my client's uncle testified that on two separate occasions, he was personally attacked by members of the Solorzano family. They approached him on the street, and then months later, while they were still looking for my client, who was in hiding because he feared for his life. They entered his home where he was present with his three-year-old daughter and his niece. They threatened to kill every member of his family. They repeatedly said that no one would be left alive. The IJ credited that entire testimony about what the Solorzanos did and the threats that my client's family faced by the Solorzano family. So I do believe that there is sufficient and objective evidence in the record credited by the IJ as to that direct point, your honor. Okay, thank you. Let me see. No, go ahead. I remember what my question was. Thank you, your honor. If I can go back to the specific legal error made by the IJ, the IJ was required to apply this two-part test. The IJ did not apply that test. The government never says the IJ asked either of the two questions that are mandated by the regulations and confirmed by this court in HH. Now, the way I read the government's brief, the government says, well, there's three reasons why it's okay that the IJ failed to apply that test. First, the government says, well, Mr. Murillo didn't fully exhaust this argument below. I disagree, your honors. He had an entire section in his brief to the BIA addressing the question of consent or acquiescence to torture by public officials. Within that section of his brief, he quotes the relevant regulation that argues and contains this two-part test, and he cites the controlling case law on the point. And more importantly, the BIA understood that he was making this point and addressed it in its opinion at addendum four. Second, the government says, well, the IJ didn't need to apply this test because the immigration judge found against Mr. Murillo on the first step of the CAT claim, which is there wasn't even enough harm here. We don't need to get to a legal determination because there weren't enough facts here to even get to step two of the CAT legal analysis. Again, I disagree. There would have been no reason for the IJ to talk about torture, acquiescence, consent, which are all legal determinations had the IJ not found he had raised sufficient facts alleging harm to put forward his CAT claim for consent or acquiescence by public officials. And on this point, your honor, I would look at specifically addendum 17, which is part of the IJ's opinion. And there she says on this claim about torture by private criminal gangs in prison, she says, well, acts of violence appear to be widespread in prisons. It is primarily the conduct of prisoners, specifically cartel and gang members, not government officials. Acts that rise to the level of torture also appear to primarily be the conduct of prisoners. This is exactly my client's claim. He is saying while he is being held in prison, he will be tortured by private gangs, not by the prison guards themselves. This case at this point in time before your honors is limited to the question of he would be tortured by private gangs who are controlled by the Salazano family. This finding by the IJ at addendum 17 specifically goes to this point and says, in fact, the violence in prison is perpetrated by these gangs. We know there is a truce. We know that public guards in charge of the prison allow access to weapons and contraband. And the violence in prisons by private gangs is immense. So I disagree with the government that the immigration judge didn't make a finding or didn't get to step two because she found against us on step one on the harm claim. And then finally, the government says, well, you can't rely on HH because the HH decision came out after the immigration judge's opinion in this case. I'm not going to argue about the timing of the HH case. It certainly came after the immigration judge's decision. But what HH said was, this has always been the test. The test is from the regulations. HH did not find a new test that was only to be applied prospectively. What the court in HH said was, this has always been the law. If you read the regulation clearly, it requires this two-part test. And that test, again, there's no claim by the government that it was ever applied. What the immigration judge did instead was cite to the matter of JE, which is the case that did not touch upon the question of consent or acquiescence by public officials to torture. Before you get to that, you've argued that BIJ applied the wrong test and suggests that we should remand and ask that the right test be applied. Is there any other different outcome we should be considering, or is that what you're asking for? We are asking for a remand for the test that should have been applied to have been applied. And it simply wasn't. And we need someone in the first instance to apply the proper test. Okay, and I think I interrupted you. I suspect you were going to distinguish matter of JE. Yes, matter of JE. Thank you, Your Honor. In matter of JE, that case involved three—I see my time is not— No, please answer the question. Thank you. Matter of JE involved a petitioner who was arguing about inhumane prison conditions generally. That was not relevant to my client's claim. It was arguing about indefinite detention. Again, not relevant to my client's claim. And then there was this separate allegation in that case about torture by public officials themselves. That was part of my client's claim, but it was only one part of it. He had a second claim, which was torture by acquiescence. That case simply did not talk about it, so it could not have properly answered the acquiescence question. With that, Your Honor, I'll preserve my time for rebuttal. Okay, let me just ask you one. This is a practical question. It doesn't go to the merits or whatever we decide. But let's assume we rule in your client's favor, the BIA, IJ were to rule in the client's favor, or there's going to be a hearing with or without him. He's in prison in Ecuador. Does he ever get to come back to the United States, or that's really discretional for Ecuador, right? He is being held in pretrial detention in Ecuador, Your Honor. He believes he is being wrongly detained in Ecuador. I understand he might be released tomorrow. We don't know what will happen with that case. The fact that he is being held certainly doesn't move the question before Your Honors. And, in fact, my client took all necessary steps to prevent the current situation he's in. He was filed with this court, with the BIA, with ICE, any avenue he could seek to try to stay in this country during the pendency of that appeal. It's unfortunate that he is where he is now, but I don't think his current situation should be held against him. Oh, no, it's not that it's being considered. But I'm asking from a practical standpoint. Even if we're to rule and he got another hearing, do they bring him back? Because obviously that's up to the, I guess, Ecuadorian. Right. Or it's a question maybe, do you do anything else? Like we've seen on occasion petitions to return. I understand that there are procedures in place by which the U.S. government can work to bring people back. And the first step in getting those procedures started is an order from this court remanding the case for further proceedings. That's what I'm asking this court to do. And I trust once we have that order, ICE will work cooperatively with us to do what we can to get the client back. Okay. Thank you. Let's hear then for counsel. Thank you very much, Your Honors. Counsel for the government. Good morning, Your Honors. May it please the Court? It may. Rachel Berman, United States Attorney General. The Court should deny the petition for review. Substantial evidence supports the agency's findings that the petitioner did not meet his burden to show that he would more likely than not be tortured in Ecuador. Therefore, he is not eligible for deferral removal under the Convention Against Torture. Could you pull the microphone down a little bit more? Thanks. Certainly, Your Honor. I'd like to address some things that this court brought up in the petitioner's argument. First, whether there's any evidence in the record that things have changed on the ground since the government began high-level work to address the problems in prison. I must disagree with the petitioner. There is evidence that conditions have changed on the ground. For example, the government released over 5,000 low-priority and elderly inmates in order to address the overcrowding concerns, which I believe was one of the parts that the United Nations and other international organizations who were invited in to assist Ecuador with this problem determined what was causing some of the violence and the other problems in prison. But this gentleman, Mr. Murillo, he's charged with attempted murder, so he's probably not at a low risk. He's probably not in the category of the 5,000 people who got released. That's true, Your Honor. But to the extent that overcrowding is and was contributing You mean if 5,000 people are released, higher security individuals will be in better conditions? It could be, Your Honor. In terms of concrete specific actions the government has taken as opposed to the commissions and the press releases and the other plans that the government has put in place. The government also sent in the military and the police into the prison systems to address the security concerns, to restore order in the prisons where there had been some loss of control due to gang violence. Let me ask, is this part of the immigration record below? Yes, Your Honor. Okay. And there's specific articles in this administrative record talking about the police regaining control of at least one prison due to the gang violence that had occurred and confiscating contraband and things of that nature. So the government is not just engaging in high-level discussions about improving conditions. The government is engaging in specific and concrete actions that have both short-term and long-term solutions to this problem. And also in terms of addressing the situation of individuals in the petitioner's specific circumstances. The petitioner did not point to any evidence about other inmates at risk of this particular family. However, we do have evidence of what the government has done when informed of risks to Ecuadorian citizens from this particular family. And so I would like to refer back to what the petitioner talked about a little bit earlier and the threats and the harm to the petitioner's uncle and his family. This happened, but once the petitioner's uncle reported this activity to the government, the government issued a protective order, which seems to have completely resolved the matter. The petitioner's uncle testified before the immigration judge, and there's been no indication that after this protective order was issued, his family has had any further problems with this particular family. So that shows that this government can successfully protect people from this family. Let me ask you this. How can we be sure that the IJ and the BIA by adoption applied the correct test in addressing the acquiescence issue? And specifically, could you address why you think the matter of JE is on point to answer that question? Sure, Your Honor. First, the immigration judge, the agency did not reach the legal determination about acquiescence here. The agency focused its decision on the factual findings, some of which would be relevant to a legal determination on acquiescence, but it didn't take that step because it was unnecessary, because the agency found he did not show sufficient likelihood of experiencing torture. Those are factual findings. So it did not reach the legal determination of acquiescence here. Moreover, the petitioner's argument that the immigration judge did not apply the correct test as found in the regulation is unexamined. That was not raised in their brief to the board. That regulation is not cited anywhere in the petitioner's brief to the board. I mean, I read the decision. Both the IJ and the BIA speak about acquiescence. They don't get considered it. They do use those words, Your Honor. But as this court has found in other cases such as De Carvalho, forgive my pronunciation, just the use of those words does not mean that the agency was making a legal determination about acquiescence. So specifically in De Carvalho, this court considered a statement by the immigration judge. As to the arrestees, the immigration judge was unpersuaded that they would even seek out the government, much less harm him with the acquiescence of the government. The court concluded that this statement was a determination about the likelihood of harm that petitioner would experience and not a legal determination regarding torture or consent or acquiescence. So that's very similar to the language here. This court also addressed similar language in Semeo Cabrera, where there the petitioner argued, well, because the agency used the word torture, and torture is a mixed question of law and fact, that must have been a legal determination. This court concluded differently, holding that in reading the agency's statement, and particularly reading it in context with the agency's decision, the agency was talking about likelihood of harm here, which is a predictive finding, a factual finding that is properly reviewed for clear error, which of course could form the basis of an acquiescence determination, but does not necessarily require that that determination has been made. So we're sort of on step one of the task this court outlined in HH, the awareness prong, and even a little before that, just the likelihood of harm, and then the agency made some factual findings about awareness, but did not take the next steps about whether the government would breach, for example, a legal duty to intervene because it was unnecessary to do so. And then your Honor. J.E., which I think you cite in your brief. Yes, Your Honor. So J.E. is certainly relevant, but it's certainly not dispositive in this case. While the petitioner conceded before the board that he was not asserting a claim solely based on the conditions in Ecuadorian prisons, his expert witness, Dr. Brotherton, certainly discussed a lot about this before the immigration judge. So it was a relevant consideration for the immigration judge to consider this case, but it was certainly not dispositive. And in the part of the immigration judge's decision where this case is cited, he discusses the matter of J.E., nor does she say that this case is dispositive of the petitioner's claim, and instead goes on to, after discussing this case, discusses the evidence from the petitioner's expert witness, then goes on to discuss evidence in the Department of State report for Ecuador for 2021, and then concludes that the petitioner did not show a sufficient likelihood of harm. So while the immigration judge mentioned this case, the immigration judge considered the specific evidence in the case before her, and nor did it say that this case controlled the outcome. Nor did the immigration judge compare the petitioner's case to a matter of J.E. and say, well, because it's so similar to J.E., the petitioner's not eligible for deferral, removal, or the Convention Against Torture. The immigration judge merely considered this case in rendering her decision. Let me ask, I believe, and again, I could be wrong, but when I reviewed both the IJA's opinion and the BIA's, it could be either or, or maybe I'm mistaken. There was an issue that this Solorzano family was, you know, or the expert really didn't know about that particular family. Is there anything you would like to highlight about that that's relevant? Yes, Your Honor. As the immigration judge highlighted, the only evidence that this family has connections with the government or the prison or the police in Ecuador or could reach the petitioner in prison solely comes from the petitioner himself. The petitioner's expert witness had no independent knowledge of this family. All he knew about this family is what the petitioner had told him. And the immigration judge found that the petitioner's assertions about this family was contradicted by or, excuse me, undermined by other evidence of record. For example, how the petitioner was able to stay, I believe, with relatives for almost a year before leaving his country and the relatives he was staying with were never bothered by the Solorzano family. He was never bothered by the Solorzano family there. And so things like this really undermined his claim that this family had the reach that he said they did. Would that also go to the question I asked Sister Counsel about the credibility? The IJ did not find him totally credible. Does that add to that you just said? The immigration judge did not find the petitioner credible, Your Honor, but the immigration judge also rendered an alternative decision on the merits and it is that decision on the merits that is before this court. Okay. Anything else or any further questions? Well, if there's nothing further, I'll briefly conclude. This court should deny the petition for review. Substantial evidence supports the agency's finding that the petitioner did not meet his burden to show that he more likely or not would experience torture in Ecuador. He is therefore not eligible for the protection that he seeks. Thank you. Thank you. Okay. We have two minutes for rebuttal. Ms. Baha. Thank you, Your Honors. Four or five quick points. On the question of prison conditions on the ground, I would direct Your Honors to A134 of the appendix where there is very specific testimony about how even though the higher levels of government have taken certain actions, there's actually been severe drastic budget cuts, which have made the conditions on the ground in prison even worse. Secondly, I would point Your Honors to case law including matter of OFAS and HH, which both indicate that government remedial action does not end the acquiescence analysis, and in De La Rosa v. Holder out of the Second Circuit where the court said the fact that some officials take action to prevent the torture would seem neither, quote, inconsistent with a finding of government acquiescence nor necessarily responsive to the question of whether torture would be inflicted by or at the instigation of or with the consent or acquiescence of a public official. It's just not necessarily probative of the question we're asking now. Third, Your Honor, my sister arguing said that after my client's uncle sought protection from the police, there have been no further problems. I could not disagree more, Your Honors, and I would point again to the sealed evidence. There's very troubling things happening as we speak. Fourth, Your Honor, my sister talked briefly about the standard of review applied by the BIA. BIA was required to apply a de novo standard of review to the legal question of consent or acquiescence. I submit that had the BIA actually reviewed de novo, they would have seen that the wrong legal test was applied. I never heard my sister say that matter of JE was relevant at all to the consent or acquiescence question. In fact, it wasn't. It didn't deal with that. Had the BIA reviewed under a de novo standard, it would have seen that the two-part test from the regulations and from HH had not been applied. Okay. Well, thank you, Counselor. Let me just ask you, out of curiosity, I know you work for Wilmer Cutler. Do you have a pro bono program for these immigration cases? We get a fair amount of pro bono cases coming in through a variety of resources in the Boston area and beyond. Oh, and this is a pro bono case? It is a pro bono case, yes, Your Honor. Okay. Well, I do want to commend the firm for doing that, and I have to say excellent representation on petitioner's behalf. Also, Ms. Berman, on behalf of USDOJ, it's been a pleasure also. Did you represent the petitioner below? No, Your Honors. But, again, thank you for doing that because it's good to have good representation on both sides. So, again, I commend both of you. Thank you very much. Have a great afternoon. All rise.